IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MEDVERSANT TECHNOLOGIES, LLC,     :   CIVIL ACTION
                                 :   NO. 15-1057
          Plaintiff,        :
                                 :
    v.                           :
                                 :
LEVERAGE HEALTH SOLUTIONS, LLC,   :
et al.,                            :
                                 :
          Defendants.       :

M E M O R A N D U M

EDUARDO C. ROBRENO, J.                   July 20, 2015

      This case involves two actions between the same principal parties proceeding in two forums: one, in this Court-- the instant action--and another, in arbitration. The issue before the Court is which parties and which claims belong in each of the forums.

I.    **FACTUAL BACKGROUND AND PROCEDURAL HISTORY**[1]

    A.   <u>The Parties</u>

      Plaintiff Medversant Technologies, LLC ("Medversant"), a California LLC with its principal office in Los Angeles, Compl. ¶ 6, ECF No. 1, has been involved in the healthcare

---

[1]      The facts are taken from the Complaint and from exhibits regarding the pending arbitration proceedings, and are viewed in the light most favorable to the party opposing the motion to compel arbitration--namely, the Plaintiff. <u>See</u> <u>infra</u> note 7.

provider credentialing industry since 1999. Id. ¶ 19.
Credentialing generally refers to the "process used to evaluate
the qualifications and practice history of healthcare providers"
according to "standards established by states, regulatory
bodies, and independent non-profit accrediting organizations."
Id. ¶ 18.

Medversant claims to have "revolutionized the industry
by developing and patenting its automated web-based
credentialing platform, which streamlines healthcare
administration, decreases administrative waste, and increases
valuable information flow within and outside [of] healthcare
organizations to protect patient security." Id. ¶ 19.

Defendant Leverage Health Solutions, LLC ("Leverage")
is a Delaware-formed LLC with its principal place of business in
Havertown, Pennsylvania. It "provide[s] business development
services to companies such as Medversant that sell industry-
specific technology and services to healthcare organizations."
Id. ¶ 7.

In January of 2010, Leverage (then known as "The
Lungen Group") entered into a Business Development and Marketing
Agreement ("the Agreement") with Medversant to provide "business
development and marketing consultant" services to Medversant.

<u>Id.</u> ¶ 22.[2] The Agreement contains an arbitration clause

("Arbitration Clause"). <u>See</u> David Moffitt Decl. Ex. 1, Agreement

§ 30 [hereinafter Agreement], ECF No. 13-3.

In the course of the Medversant-Leverage business

relationship, according to Medversant, Leverage "gained

comprehensive knowledge" of Medversant's trade secrets relating

to its credentialing methods and technology. Compl ¶ 25.

In August of 2012, pursuant to the Agreement,

Medversant directed Leverage--through its agents, Defendants

Richard Lungen, Charles J. Falcone, and David Reilly

(collectively with Leverage, "the Leverage Defendants")--to

negotiate Medversant's purchase of Defendant Aperture

Credentialing, LLC ("Aperture"), a credentialing company with

its principal place of business in Louisville, Kentucky, from

---

[2]       Section 4 of the Agreement states that the Agreement
would terminate on January 31, 2015, provided that other grounds
for termination or default, including the following, do not
arise:

    (i) [Leverage] represents any other vendor competing
    with Medversant other than as agreed upon in writing
    by the parties[;]

    (ii) [Leverage] violates the noncompete agreement
    contained in Section 13 of this Agreement[;] [or]

    (iii) [Leverage] commits gross negligence, fraud or
    any civil or criminal act which results in Medversant
    liability[.]

David Moffitt Decl. Ex. 1, Interim Business Development and
Marketing Agreement § 4(a)(ii), ECF No. 13-3.

its then-owner Optum. Id. ¶¶ 9, 26–28. Although "Medversant entrusted [the Leverage Defendants] with communicating with Optum . . . throughout 2013 about Medversant's anticipated purchase of Aperture," id. ¶ 28, "Optum's communications about the intended sale of Aperture waned, and the sale . . . was never consummated," id. ¶ 29.

B.   The Arbitration Proceedings

At some point over the course of their partnership, relations between Leverage and Medversant soured,[3] to the extent that Medversant filed a demand for arbitration before the American Arbitration Association ("AAA")--pursuant to the Arbitration Clause of the Agreement[4]--against Leverage on May 19, 2014 ("AAA Arbitration"). See Moffitt Decl. Ex. 3, Demand for Arbitration. In describing its claims to the AAA Administrator on June 16, 2014, Medversant stated, "[t]his matter involves claims by Medversant seeking damages for breach of the Agreement and for tort damages arising out of the negligent acts and omissions of [Leverage's] employees or agents in the performance

---

[3]   Medversant claims that "throughout the course of [their] business relationship . . . , [the] Leverage [Defendants] . . . did not adequately perform [their] marketing and business development duties." Compl. ¶ 44.

[4]   The Arbitration Clause states that "[a]ny disputes that arise between the parties with respect to the performance of this agreement shall be submitted to arbitration by the American Arbitration Association." Agreement § 30.

of its responsibilities under the Agreement." Id. Ex. 4, Letter
to AAA Administrator 1.[5]

On October 14, 2014, Medversant filed an expanded
statement of claims in the pending AAA Arbitration proceeding.
See id. Ex. 5, Expanded Statement of Claims. With this expanded
statement, the claims asserted by Medversant in the AAA
Arbitration now include, inter alia, breach of contract, breach
of the implied covenant of good faith and fair dealing, and
breach of fiduciary duty constituting fraud. Id.

C.   The Instant Action

In September of 2014, in the midst of the AAA
Arbitration proceedings, Leverage itself acquired and began to
operate Aperture,[6] see Compl. ¶¶ 8, 30-33--according to
Medversant--"in direct competition with Medversant," id. ¶ 33.
Medversant did not learn of this acquisition until January 2015.
Id. ¶ 34. While Aperture had hitherto been "a poorly performing

---

[5]     Leverage filed counterclaims against Medversant in the
AAA Arbitration proceeding, alleging that Medversant
unjustifiably stopped paying Leverage the monthly $15,000
commission required by the Agreement in May 2013, despite the
fact that Leverage continued to provide marketing services to
Medversant. See Moffitt Decl. Ex. 9, Leverage Counterclaims
¶¶ 11, 18.

[6]     Richard Lungen and Charles Falcone are managing
members of Leverage, and David Reilly is Senior Operations
Consultant at Leverage; Falcone and Reilly also became,
respectively, Chief Executive Officer and Senior Vice President
of Aperture. Compl. ¶¶ 10-12.

credentialing business," it now advertises possession of
"proprietary tools" and touts itself as the "nation's largest
and most experienced healthcare provider credentialing company."
Id. ¶ 37.

Medversant asserts that the acquisition constituted a
breach of the Leverage Defendants' fiduciary obligations under
the Agreement. It further alleges that Defendants have
misappropriated its trade secrets in order to unfairly compete
with Medversant "for certain clients desiring fully automated
provider credentialing." Id. ¶¶ 38-39.

On March 2, 2015, Medversant filed the instant
Complaint, asserting claims of fraud (Count I) and tortious
interference with contract (Count III) against the Leverage
Defendants, and claims of unfair competition (Count II),
misappropriation of trade secrets (Count IV), and civil
conspiracy (Count V) against all Defendants. Id ¶¶ 45-91.
Medversant seeks compensatory, consequential, and punitive
damages; reasonable attorneys' fees; and injunctive relief
against Defendants.

On April 1, 2015, the Leverage Defendants filed a
motion to compel arbitration[7] of the claims pending in the
instant action, seeking to require Medversant to litigate all of

---

[7]        In the alternative, the Leverage Defendants have moved
to dismiss Plaintiff's fraud claim as insufficiently pled.

its claims against the Leverage Defendants in the AAA
Arbitration proceedings now pending. ECF No. 13. Aperture then
filed a motion to stay the instant case pending the completion
of the AAA Arbitration proceedings between Medversant and the
Leverage Defendants.[8] ECF No. 11. Medversant filed responses to
both motions, ECF Nos. 26, 28, and the Leverage Defendants moved
for leave to file a reply brief, ECF No. 29. The motions are
ripe for disposition.

## II.  LEGAL STANDARD

A motion to compel arbitration is decided using the
Federal Rule of Civil Procedure 12(b)(6) motion to dismiss
standard[9] when "it is apparent, based on the face of a complaint,
and documents relied upon in the complaint, that certain of a
party's claims are subject to an enforceable arbitration

---

[8]      Although Aperture's brief specifically requested a
stay only until the Court rules on the Leverage Defendants'
motion to compel arbitration, see Aperture Mot. Stay 8, counsel
for Aperture requested at the June 15, 2015, hearing on these
motions that the matter be stayed pending the conclusion of the
AAA Arbitration between Medversant and the Leverage Defendants.
The Court will accept this latest and final representation of
Aperture's position, and will so construe its motion to stay.

[9]      When considering a motion to dismiss a complaint for
failure to state a claim upon which relief can be granted under
Rule 12(b)(6), a court must "accept as true all allegations in
the complaint and all reasonable inferences that can be drawn
therefrom, and view them in the light most favorable to the non-
moving party." DeBenedictis v. Merrill Lynch & Co., 492 F.3d
209, 215 (3d Cir. 2007) (internal quotation marks omitted).

clause." <u>Guidotti v. Legal Helpers Debt Resolution, L.L.C.</u>, 716 F.3d 764, 776 (3d Cir. 2013) (internal quotation marks omitted).

Questions of arbitrability are "undeniably . . . issue[s] for judicial determination." <u>AT & T Techs., Inc. v. Commc'ns Workers of Am.</u>, 475 U.S. 643, 649 (1986). In determining whether to compel arbitration, the Court must answer two threshold questions: "(1) Did the parties seeking or resisting arbitration enter into a valid arbitration agreement? (2) Does the dispute between those parties fall within the language of the arbitration agreement?" <u>John Hancock Mut. Life Ins. Co. v. Olick</u>, 151 F.3d 132, 137 (3d Cir. 1998). Unless both questions are answered in the affirmative, arbitration will not be compelled.

As to the second question of whether a dispute falls within the scope of an arbitration clause, the Supreme Court has declared that there is a "liberal federal policy favoring arbitration," <u>AT & T Mobility LLC v. Concepcion</u>, 131 S. Ct. 1740, 1745 (2011) (internal quotation marks omitted). Under the Federal Arbitration Act (the "FAA"), "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration," <u>Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.</u>, 460 U.S. 1, 24-25 (1983). The Supreme Court has further stated that the "presumption of arbitrability" "is particularly applicable where the [arbitration] clause is . . . broad." <u>AT &</u>

T Techs., 475 U.S. at 650. "Cases holding that the arbitration clauses at issue are narrow have generally relied on expressly limiting the scope of the clause to specific subject matter." United Steelworkers of Am., AFL–CIO–CLC v. Rohm & Haas Co., 522 F.3d 324, 331 (3d Cir. 2008).

## III. DISCUSSION

    A.   The Leverage Defendants' Motion to Compel Arbitration

        The Leverage Defendants have moved for the Court to compel arbitration and dismiss the Complaint or, in the alternative, to dismiss Count I of the Complaint for failure to state a claim for fraud.[10] Here, the parties do not dispute the validity of the Arbitration Clause--the first threshold question the Court must answer--and, in fact, Medversant has invoked said clause in its pending AAA Arbitration proceedings with Leverage. Rather, Medversant contends[11] that this dispute does not fall within the scope of the Arbitration Clause--which goes to the second threshold question the Court must decide.

_____

[10]    Because the Court will grant the Leverage Defendants' motion to compel arbitration, the Court need not consider Defendants alternative motion to dismiss the fraud claim.

[11]    Although Medversant argues in its response that California law--rather than the FAA--controls in this case, see Pl.'s Resp. Mot. Compel 6, at the hearing regarding the motion to compel held on June 15, 2016, Medversant conceded that the FAA governs in this matter. Accordingly, the Court need not visit the parties' discussion regarding the applicability of the FAA.

The Third Circuit, in CardioNet, Inc. v. Cigna Health Corp., 751 F.3d 165 (3d Cir. 2014), laid out the analytical framework that a court should apply in determining the scope of an arbitration clause. The underlying district court case involved a suit between plaintiffs CardioNet, Inc., and LifeWatch Services, Inc.--providers of outpatient cardiac telemetry ("OCT") devices that allow physicians to monitor cardiac arrhythmias--and defendant insurance company CIGNA Health Corporation. CardioNet, Inc. v. Cigna Health Corp., 945 F. Supp. 2d 620, 622 (E.D. Pa. 2013) (Robreno, J.). In 2007, the plaintiffs joined the defendant's provider network by entering into identical Administrative Service Agreements with the defendant, which set the rate at which the defendant would reimburse the plaintiffs for certain "Covered Services." Id. The agreements contained an arbitration clause which stated that "[a]rbitration is the exclusive remedy" for "[d]isputes . . . regarding the performance or interpretation of the Agreement." Id. at 625-26.

For several years, Defendant provided coverage for the OCT services offered by the plaintiffs, finding that "there [wa]s sufficient evidence in the published peer reviewed literature supporting the use" of the plaintiffs' devices. Id. at 622 (internal quotation marks omitted). Then, in 2012, Defendant issued a "Physician Update" announcing that it would

10

no longer cover the OCT devices "because they were experimental, investigational and unproven." Id. (internal quotation marks omitted).

The plaintiffs filed suit against the defendant, alleging that because of the policy change, "OCT orders for CIGNA patients have virtually ceased, and orders for non-CIGNA patients have also been adversely [a]ffected." Id. at 623. In their complaint, the plaintiffs raised claims--both directly, on their own behalf, and derivatively, as assignees of certain patients who used their services--under the Employee Retirement Income Security Act of 1974 ("ERISA"), along with breach of contract claims, all related to the defendant's allegedly wrongful withdrawal of coverage. Id.

In response, the defendant moved to compel arbitration pursuant to the arbitration clause in the parties' agreement. The district court determined that the arbitration provision was broad, "therefore creating a presumption of arbitrability" that was applicable to the claims before the court regarding the defendant's withdrawal of coverage. Id. at 625-26. Accordingly, the district court granted the defendant's motion to compel arbitration. Id. at 628.

The Third Circuit reversed, however, reasoning that (1) certain contractual language would be rendered "nugatory" without a narrowing circumscription of the arbitration clause,

CardioNet, 751 F.3d at 174, and that (2) "[t]he resolution of
the[] claims [did] not require construction of, or even
reference to, any provision in the Agreement,"[12] id. at 175.
Essentially, the Third Circuit viewed the district court's
analysis of the arbitration clause's scope as going beyond the
narrow ambit of disputes "regarding the performance or
interpretation of the Agreement." Id. at 174. The Third Circuit
held that, because "the facts underpinning the[] . . . claims
d[id] not concern the performance or interpretation of the
parties' Agreement," the "claims f[e]ll outside the scope of the
Agreement's arbitration clause." Id. at 176.

Following CardioNet, it is now clear that "[i]n
assessing whether a particular dispute falls within the scope of
an arbitration clause," a court looks not to the labels or legal
theories attached to the claims--as apparently the district
court in CardioNet had done--but rather it must "focus[] on the
factual underpinnings of the claim." Id. at 173 (second
alteration in original) (quoting Medtronic AVE Inc. v. Advanced
Cardiovascular Sys., Inc., 100 F.3d 44, 55 (3rd Cir. 2001))
(internal quotation marks omitted).

---

[12]       Rather, the Third Circuit pointed out that "the
adjudication of [some of the plaintiffs'] claims depends on
whether the Physician Update--a document completely distinct
from the Agreement--is deceptive and misleading, and whether any
deceptions therein caused a cognizable injury to the
[plaintiffs]." Id. at 175.

In this case the Arbitration Clause states that "[a]ny disputes that arise between the parties with respect to the performance of this agreement shall be submitted to arbitration by the American Arbitration Association." Agreement § 30. The crucial issue is, therefore, whether under <u>CardioNet</u> the facts underlying the parties' dispute relate "to the performance of this agreement." <u>See</u> <u>CardioNet</u>, 751 F.3d at 174-75.[13]

The Complaint raises claims of fraud, unfair competition, tortious interference with contract, misappropriation of trade secrets, and civil conspiracy. Focusing on the factual underpinnings of this dispute and putting the legal theories aside, as required by <u>CardioNet</u>, it appears that Medversant's five claims for relief can essentially be reduced to two factual allegations: (1) Leverage was contractually obligated to aid Medversant in acquiring Aperture,

[13]    The claims Medversant has raised in arbitration are supported by a number of factual allegations that are similar to those set forth in the instant Complaint. For example, in the Expanded Statement of Claims it filed in the arbitration, Medversant alleges that "on repeated occasions [and] without permission of Medversant, [Leverage] disclosed confidential and proprietary information and systems of Medversant to actual and potential competitors of Medversant." Moffitt Decl. Ex. 5, Expanded Statement of Claims ¶ 3(b). Medversant also asserts that despite Leverage's duties as "agent" and "fiduciary of Medversant," it "intentionally . . . foster[ed] its own interests over those of Medversant, possibly with the intention of taking over Medversant, such as disclosing confidential information and systems of Medversant and disparaging Medversant in the healthcare community"--conduct that "constitute[d] oppression, malice, and/or fraud on the part of Leverage." <u>Id.</u> ¶¶ 7, 10.

but instead fraudulently violated that obligation by acquiring Aperture itself without informing Medversant; and (2) Leverage misappropriated Medversant's confidential trade secrets.

Although cast as tort claims, Medversant's claims are nevertheless within the scope of the Arbitration Clause, given that "the facts underpinning . . . [P]laintiff's claims" inextricably "relate to the performance" of the Agreement. Id. at 176. For instance, Medversant's misappropriation claim is in substance a claim that Leverage breached the confidentiality and nondisclosure provisions in Paragraph 12 of the Agreement. That paragraph states that "information obtained by or provided to the other party in carrying out the Services provided for hereunder . . . will be maintained in confidence by that party and that parties will not publish nor disclose to third persons nor otherwise make use of such confidential information." Agreement ¶ 12. In fact, the Complaint specifically refers to this confidentiality provision in the Agreement. Compl. ¶ 73. Focusing on the factual basis rather than the legal theory behind Medversant's misappropriation claim, the scope of and the alleged breach of the confidentiality provision in the Agreement renders this claim as a "dispute arising between the parties with respect to the performance of this agreement." See CardioNet, 751 F.3d at 173.

14

Medversant also asserts that Medversant and Leverage
contractually "agreed" that Leverage would "serve as
Medversant's sales executive and take full responsibility for
marketing and business development on Medversant's behalf,"
Compl. ¶ 24--a commitment that Medversant alleges was a
fraudulent misrepresentation, given the Leverage Defendants'
subsequent conduct. The facts underlying Medversant's fraud
claim in the Complaint arise out of an allegedly breached
obligation to pursue an acquisition of Aperture on Leverage's
behalf as Medversant's "business development and marketing
consultant" under the Agreement, See id. ¶¶ 22-25. Thus, this
claim constitutes a "dispute arising between the parties with
respect to the performance of this agreement." See CardioNet,
751 F.3d at 173.

The same can be said for Medversant's unlawful
competition, tortious interference with contract, and civil
conspiracy claims. Given that the Leverage Defendants would have
been free to pursue Aperture themselves absent the Agreement
(under which they were to pursue Aperture on behalf of
Medversant), their actions would not then have been potentially
tortious. These allegedly wrongful acts each precisely mirror a
corresponding contractual duty that Medversant avers the Leverage
Defendants violated. Accordingly, these claims substantially
depend upon and relate to "the performance" of the Agreement,

15

for without it, Medversant could not allege that Leverage's
conduct was fraudulent, tortiously interfering, unfairly
competitive, or actionably conspiratorial. <u>Id.</u>

Because the Court finds that the FAA applies, and
because the claims against Leverage fall within the scope of the
Arbitration Clause, the Court will grant the motion to compel
arbitration.

B.   <u>Claims Against the Individual Defendants</u>

The Third Circuit has stated that "arbitration
agreements may be upheld against non-parties where the interests
of such parties are directly related to, if not congruent with,
those of a signatory." <u>Pritzker v. Merrill Lynch, Pierce, Fenner</u>
<u>& Smith, Inc.</u>, 7 F.3d 1110, 1122 (3d Cir. 1993) (citation
omitted).

According to the Complaint, Defendants Lungen and
Falcone are Managing Members of Leverage, and Reilly is Senior
Operations Consultant at Leverage. Compl. ¶¶ 10-12. Even though
these individual Defendants were not personal signatories to the
Agreement, under <u>Pritzker</u> the Arbitration Clause applies to them
because their interests are "directly related to" those of
Leverage, 7 F.3d at 1122--which is borne out by the fact that
Medversant's claims against the individual Defendants are
identical to those raised against Leverage. Accordingly, the

16

Court will grant the Leverage Defendants' motion to compel

arbitration as to the individual Defendants as well.[14]

    C.   <u>Aperture's Motion to Stay</u>

        Aperture is not a party to the arbitration agreement.

Nor is its interest in the outcome of the litigation "directly

related" to the interest of Leverage. <u>Id.</u> Under these

circumstances, Aperture has moved to stay the proceedings against

it pending the resolution of the arbitration between Medversant

and the Leverage Defendants. "[The] decision [to stay litigation]

is one left to the district court . . . as a matter of its

discretion to control its docket." <u>Mendez v. Puerto Rican Int'l

Cos.</u>, 553 F.3d 709, 712 (3d Cir. 2009) (quoting <u>Moses H. Cone

Mem'l Hosp.</u>, 460 U.S. at 20 n.23). In determining whether a stay

should be granted, the Court "must weigh competing interests,"

<u>Landis v. N. Am. Co.</u>, 299 U.S. 248, 254-55 (1936), considering

factors such as the risk of prejudice to the non-moving party,

potential hardship or inequity to the proponent of the stay, and

interests in judicial economy and efficiency, <u>see id.</u>

        The Court will exercise its discretion to stay the

action against Aperture for at least three reasons.

---

[14]      The Court further notes that, at the hearing on these
motions, counsel for Defendants Lungen, Falcone, and Reilly
represented that said Defendants have each agreed to participate
in arbitration between the Leverage Defendants and Medversant,
should the Court so order.

First, this Court may stay a case "to abide the outcome of another [proceeding] which may substantially affect it or be dispositive of the issues," Bechtel Corp. v. Local 215, Laborers' Int'l Union of N. Am., AFL-CIO, 544 F.2d 1207, 1215 (3d Cir. 1976)--which is of principal importance here, given the substantially overlapping claims against both Aperture and the Leverage Defendants, and the risk of inconsistent rulings. If the Leverage Defendants prevail in the AAA Arbitration proceedings, the claims against Aperture will be resolved; if Medversant prevails, it can at that time resume the instant case to pursue its remaining claims against Aperture.

Second, a stay would not materially prejudice Medversant, since it could renew any remaining claims against Aperture upon the completion of the AAA Arbitration between Medversant and the Leverage Defendants.

And third, a stay would avoid unnecessarily duplicative efforts by the parties and would best serve the interests of judicial economy and efficiency.

Therefore, the Court will grant Aperture's motion to stay the action pending the conclusion of the AAA Arbitration proceedings.

**IV.   CONCLUSION**

For the foregoing reasons, the Court will grant the Leverage Defendants' motion to compel arbitration, and will grant Aperture's motion to stay pending the conclusion of the AAA Arbitration proceedings between Medversant and the Leverage Defendants. An appropriate order follows.